My name is Catherine Young. I represent the appellant in this matter, Mr. Bruce Michael Latorre, under the supervision of Mr. Tom Fleener. The issues in this case arise from a stop of Mr. Latorre at a small airport in Evanston, Wyoming, on December 9, 2016. Stay close to the mic so everyone can hear you.  The Wyoming DCI requested Mr. Latorre's identification and pilot's license, effectively detaining him at that point. Agent Matson later acknowledged that he requested those documents as a stall tactic, that he did not have a reasonable suspicion of criminal activity, and that he personally knew very little information about the request to stall Mr. Latorre. What does reasonable suspicion require? Reasonable suspicion requires knowledge of facts that you can reasonably say that someone is or is about to be engaged in criminal activity. A minimum level? It is less than probable cause, certainly, yes. But it does require more than a hunch or an unarticulable suspicion. Don't we have that here? They followed this guy for two days over thousands of miles. Lieutenant Weidler observed behaviors that he considered suspicious, that's true. But if you look at the totality of the circumstances, many of those factors were not objectively suspicious. And even if they were, Agent Matson certainly did not have a reasonable suspicion of criminal activity, and Lieutenant Weidler's information was not properly imputed to him under the collective knowledge. Don't we take into account the experience and the professionalism of the particular officers involved, and when they see somebody without a transponder going from one place to the next and then going back the same way, doesn't that raise a little suspicion in your mind if you're a policeman? We do defer to the experience of an officer, but that alone does not travel, especially with air travel. It's pretty common to see people traveling to one place and another pretty quickly, so that in and of itself is not objectively suspicious, as many of the other factors also were not. But even if Lieutenant Weidler had a reasonable suspicion of criminal activity, the collective knowledge doctrine could not justify Agent Matson's stop in this situation. The collective knowledge doctrine can justify a stop by an officer who does not have a reasonable suspicion of criminal activity. What we have here is an investigative detention, is that right? That's correct. And what requirement must be met by the officers in order to do that? By the officer who actually did the detaining? Yes. Well, that's the problem with this case, is that Agent Matson didn't know anything about the reasons why he had been asked to see all the observatories. You couldn't just stop him and say, what's your name, and I need to see your pilot license, I need the registration for your aircraft. He couldn't do that? Just a clean, Terry stop? No, because he did not have any information or knowledge about suspicious behavior on the part of Mr. Latore, other than that he had a criminal history. And when he requested those documents, that's when it became an unlawful detention at that point. Were you saying that the collective knowledge, vertical collective knowledge, cannot be employed here? Not in these circumstances. Why not? Because the chain of communication originating with Lieutenant Weidler and finally after going through multiple officers and landing on Agent Matson was far too attenuated to impute that knowledge to him. In what sense? Were there too many links in the chain? That's one problem, but there are others that make it distinguishable from cases like Rodriguez-Rodriguez. Well, in Rodriguez-Rodriguez, there were multiple links, correct? There were two links in that case. In this case, there are four. Why would the difference between two and four make a difference? It goes to the attenuation of the information, but there are also other differences from Rodriguez-Rodriguez that make this case different. Another difference is that in Rodriguez-Rodriguez, the investigation occurred very rapidly. It was a matter of six miles and minutes where those two chains of communication occurred. Whereas here, this was an investigation lasting three days over multiple states. Also, Rodriguez-Rodriguez involved imputation of probable cause, which is a much higher standard than reasonable suspicion, which is inherently more reliable information. Whereas here, you're asking to impute a less reliable standard of information along a longer chain of communication, and that's the point where this collective knowledge doctrine can no longer work. Now, wasn't Weidler, whom I think you would admit had sufficient knowledge to stop, had certainly enough for reasonable suspicion, wasn't he in constant contact with the people at the airport in Wyoming? He was not. He did not speak to the people at the airport in Wyoming. He spoke to agents in Omaha, Nebraska. He did not specifically recall what information he relayed to them, other than that he updated them on his investigation. We don't know exactly what those Omaha HSI agents then said to the Salt Lake HSI agents, but they did know that an airplane was expected to arrive in Wyoming that was suspected of some criminal activity. Those agents then contacted the Wyoming agents who ultimately stopped Mr. Latorre. And that's where this problem arises, is that we also don't know exactly what information Lieutenant Weidler transmitted, other than a criminal history. We do know that he didn't issue any instructions or requests to stop Mr. Latorre. It was agents further along in this chain of communication. Well, I thought Matson was told to hold him, to detain him. Don't let the plane leave. He was told to stall him at the airport until Salt Lake HSI agents could get there. But he was not told why. He was not told why. He said the airplane was suspected of criminal activity, is all he was told, and to stall to the best of his ability. Did he know where that information was coming from? He knew that it came from HSI agents out of Salt Lake City, but he did not know where they were getting that information. Homeland Security, is that what you're talking about? Yes, yeah. He did not know where they were getting their information from. What if Agent Lowry had enough information for a Terry stop? Then there would only be one link, right, between Lowry and Matson. And so if Lowry had enough information for an investigative detention, would you agree that we should affirm? In that situation, I think that it would be different because that chain of communication would be much more clear about what exactly was transmitted to whom, who knew what, and in that circumstance, Agent Matson would be much more justified in detaining Mr. Latore. Okay, so Agent Lowry knew that the plane had gone in and out of radar because it had no transponder, correct? I don't recall that Agent Lowry knew that. I believe he knew that someone observed behavior that was suspicious  I don't believe that he testified that he knew any details of that suspicious activity. Well, he did know, let me ask you about another fact, Agent Lowry did testify, did he not, that he understood that the plane had been involved in drug smuggling? He had been told about the aircraft pilot's criminal history, yes. So he did have limited information, but criminal history alone cannot go to reasonable suspicion or amount to reasonable suspicion, and given his... Why not? We have a lot of cases, presidential cases, that say that criminal history is sufficient not only for reasonable suspicion, but for probable cause. Not necessarily in itself, but it's certainly a substantial factor. Criminal history is a factor, but it cannot be a factor standing alone, and that really is all the information that Agent Lowry and Agent Mattson had. We don't know the extent of the information with the Omaha HSI agents, but really the bulk of the information was with Lieutenant Weidler, who was four degrees removed from the officer who ultimately acted on the information and who never communicated with the Wyoming agents. Maybe we need to move on to other issues. What about the consent to search? So because Mr. Latore's stop was illegal because the collective knowledge doctrine does not apply, that consent was tainted, and I believe the government conceded that if this court were to find this was an illegal detention, that they would concede that that was a tainted consent. If the stop was good, is the consent still bad? It is, Your Honor. Why? In addition to being out of an illegal detention, it was also not voluntary under the totality of the circumstances because Mr. Latore was removed from his vehicle or his mode of transportation. His documents were retained, and he never received them back. He was transported into the lobby with three officers, and he was told that it was a consensual encounter, but it wasn't really explained to what that meant. Wasn't he told that he could leave any time? He was free to leave? Was he told that? I believe he was just told that it was a consensual encounter, and I don't believe that there's any information in the record. And his documents, his pilot's license, and the registration for the airplane, they were placed on a chair between he and one of the officers? Yes, they were placed on a chair between him and another officer, which it would be, I think, incredibly uncommon for a normal, an ordinary citizen to reach out and take something from an officer who had already had them, who sat on a chair, and reach out to take those. I don't think that a reasonable citizen would feel that they were allowed to do that in those circumstances. So in addition to the consent being tainted by the illegal detention, even if this court were not to find that, it was not voluntary under the totality of the circumstances. And then we have a question about grand jury testimony in New York. We do, Your Honor. And that occurred several months later in June. Was he detained, arrested, held between these two events when he was stopped and questioned at the airport? He was not. So he was placed in handcuffs at the airport, but he was released. I don't believe that they took him into custody, but there were subsequent interviews with the same officers, and they kept- And why in Wyoming? I believe he was allowed to return to California, but there were other interviews in Wyoming as well. The agents maintained contact with him throughout this process, provided him with a plane ticket to fly out to New York and testify at the grand jury. And I think that you can infer that he did that because he expected that the government was going to do something helpful for him in return. So I think that that goes to the issue of whether that testimony is also tainted. There were not enough intervening circumstances because of the contact between the agents and Latore. They're purchasing- Well, there was a huge break of time, wasn't there? There was a break of time, but time alone is not dispositive. And when you're considering these other factors, he didn't receive fresh Miranda warnings. He wasn't represented by counsel. He pretty clearly- Had he received Miranda warnings at any time in this case? He did after he consented or arguably consented to the search of his aircraft, and they found the money in the plane. He was informed of Miranda after that occurred. And was he interviewed the next day and again given Miranda warnings? Yes, the next day. But the testimony at the grand jury occurred much later, and he did not receive a fresh set of Miranda warnings at that time  So it just goes to the government not meeting its burden of showing that that testimony was no longer tainted. And unless the court has any other questions, I'm about out of time. Thank you. Well done. Thank you. Good morning. Good morning, Your Honors. May it please the court? Counsel? Your Honors, Thomas Schott for the United States. I work out of the U.S. Attorney's Office in Cheyenne, Wyoming. And I was also counsel below. Just briefly by way of background, this case began with an investigation by a state police lieutenant in Illinois who was monitoring a software product that enabled him to track what I'll call really blips on effectively information from FAA radar. So he's observing air traffic in Illinois. He spots what he referred to as a primary target. And that is a blip on his screen that is not operating a transponder. In other words, he sees the blip moving and he knows its airspeed, but he doesn't have other information about it because it's not operating a transponder. Is there any requirement that you must have your transponder on when you fly on any distance? I don't believe that distance imposes any requirement, Your Honor. There are various different areas of what are called controlled airspace. There's also uncontrolled airspace. And I believe it certainly would be possible to fly from small airports exclusively in uncontrolled airspace without a transponder. And that's lower altitude? I believe that 10,000 feet is a threshold, Your Honor. Okay, so he was flying below 10,000 feet without a transponder. Well, it's unclear how high he was flying, Your Honor, because without the transponder, as I recall, there's no altitude information. Now, he certainly later claimed that he was flying below 10,000 feet. And I believe that Lieutenant Weidler's testimony was he couldn't ascertain one way or the other whether this aircraft was complying with applicable FAA regulations. In any event, Lieutenant Weidler in Illinois monitoring his software continues to observe the blip as it flies eastward, stops at an airport in Wayne County, Ohio. The lieutenant speaks with an airport employee who tells him that the pilot is supposedly going to Buffalo to visit family. They lose track of the blip, and then they track it again the next day as it flies back west. And ultimately, on December the 9th, land. Did you track him to Buffalo? I don't believe they tracked it to Buffalo, Your Honor. Or into the vicinity? I can't remember the specific testimony of where they lost it. I believe it may have been somewhere in Ohio. But what they observed the next day was a similar-looking primary target, so no transponder, appears in Hamburg, New York, which is near Buffalo, flying the opposite direction. And they believe it's the same aircraft. And later, because that aircraft lands in Nebraska and its tail number is identified, they are able to ascertain that indeed the aircraft that had been flying east on December 7th was now flying west on December 9th by that point in time. The collective knowledge issue arises because Lieutenant Weidler, the police lieutenant in Illinois, does most of the investigation. He's communicating with Homeland Security Investigation Special Agent in Omaha, who is communicating with a Homeland Security Investigation Special Agent in Salt Lake, who is then communicating with Wyoming DCI in southwest Wyoming. So there are multiple levels that are involved here, and that's why the collective knowledge issue arises. I'd like to begin, Judge Bacharach, with the question you posed, that if Special Agent Lowry, that's the Homeland Security officer in Salt Lake, if he had enough information, should the court affirm, and the government would say yes, that's really related to an alternative argument that I raised in the footnote in the brief, which was that setting aside the justification all the way to the top, or to some extent, if Special Agent Mattson himself, the officer who actually detained Mr. Latore, if he had sufficient reasonable suspicion on his own, then the stop was good. And his information is coming from only one step above, which is from Agent Lowry in Volume 2. So what did he know? The agent that stopped, or the officer that stopped the defendant, what did he know? Your Honor, it's funny you should ask. That's at page 77 of Volume 2 of the appendix, and here's what he testified to. This is Special Agent Mattson testifying, and he's getting this information from his colleague, Agent Leichty. And by the way, just a quick footnote, Agent Leichty's name is spelled wrong. In my brief and throughout the record, it's actually L-I-E-C-H-T-Y, so I apologize for that. But Agent Leichty, or Officer Leichty, is getting the information from Lowry. And what Leichty tells Mattson is, he told me HSI out of Salt Lake had reported to him that there was an aircraft that was due to land in Evanston about 1 o'clock that may be carrying narcotics, and that the aircraft owner's name was a Bruce Latore, and he had a history of flying marijuana across the country, and had actually been caught by DEA back in 2011. And then moving further in Mattson's testimony, Leichty had indicated, and Leichty is me putting the brackets in, and he had indicated that HSI reported to him that they had been notified by the Illinois State Patrol Air Unit that this aircraft was flying suspiciously, and they're the ones that had reported to HSI that it may be carrying narcotics. And then Agent Mattson recalled Leichty telling him that the transponder wasn't turned on. And at the time, that didn't mean anything to Mattson. He didn't know about transponders, although he later asked about it. So in answer to your question, Judge Briscoe, and following up on Judge Bacharach's earlier point, that's the information that Agent Mattson had. And the government would submit that that's sufficient reasonable suspicion to conduct a terrorist stop at the airport. The collective knowledge doctrine still probably applies because Mattson is relying in a conclusory fashion on the statements that the airplane is flying suspiciously and might have drugs. And if there were no foundation upstream for those conclusions, then certainly the reasonable suspicion at the bottom would be inaccurate. Well, how far does the vertical collective knowledge go, 10, 20, 30, 40 people? Could it? Yes, it could, Your Honor. I think it would depend on the facts of the case. I certainly agree with Ms. Young about the difference in the numbers of relationships with this case as opposed to the Rodriguez case. But those differences are explained simply by the factual differences in the cases. In Rodriguez, we are talking about a traffic stop with officers who are physically present in the same location, speaking to one another. The nature of this investigation really dictated the number of collective knowledge relationships because we've got an aircraft that's flying across the country. It never stopped in Illinois. Lieutenant Weidler in Illinois just happened to be the one who noticed it. So he's calling employees at airports in different states. He's calling Omaha because I believe that they were the ones who were listed as a point of contact by the AMOC entity. So he gets their names. So he's calling Omaha. The only reason that Omaha is then calling Salt Lake is because Weidler learns that the aircraft is en route to Evanston, Wyoming. So HSI in Omaha is calling HSI in Salt Lake because the testimony was they're about 45 minutes from Evanston. But even they were afraid they weren't going to get there in time and, in fact, did not get there in time. So that's why they involved Wyoming DCI. So I guess in answer to your question, Judge Kelly, I think, depending on the nature of the case, that there may be that level of that number of relationships. And the policy really underlying the collective knowledge doctrine, I think, in a case like this where you're talking about the need to try to effect a stop of an aircraft that's moving quickly and using these small airports, it just was really dictated by the nature of the investigation. Although there may be pragmatic reasons, particularly when you have an airplane who's traveling, obviously, at a high velocity, doesn't it also logically follow that the more links in the chain, and I think this is probably implicated by your answer to Judge Kelly, the more links in the chain you have, the greater the likelihood that something is going to be distorted. You know, there's an elementary school game that we all play, and you repeat something, and by the end of it, you know, it doesn't have any familiarity with what was originated. So if these law enforcement officers and you are communicating simply conclusions in four links, what is there about that number of links and their communication that gives this an indicia that we should have confidence in the fact that these communications are reliable? After all, if any one link distorts what's said, then that would distort the ultimate conclusion. I agree with your analysis, Your Honor. I think the game of telephone is really an apt analogy for the risk. The risk is mitigated if we're talking about a conclusion that's being filtered down, because if the conclusion is this plane might have drugs on board, that's pretty simple, and that conclusion can be passed from mouth to mouth. Really, that's vertical collective knowledge is talking about passing down an order or request, please stop this person, or a conclusion, there's cocaine in that truck, or there might be drugs in that airplane. Now, where the game of telephone would really come in is if we're talking about the underlying facts. Your Honor, I think certainly this case could illustrate that, because Lieutenant Weiler passes the underlying facts. He said he was flying to Buffalo to visit family. He paid cash for his fuel in Ohio. The details about the transponder, et cetera, it's extremely unlikely that those minutia are going to pass all the way to the bottom, and, in fact, they did not. So if we're talking about a scenario where the officer at the bottom needs to be aware of specific facts and sort of make his own conclusion with respect to reasonable suspicion, that game of telephone could be a problem. If we're talking, rather, about, though, that Illinois thinks this guy is suspicious, and maybe here are some of the reasons why, but really the underlying conclusion, they think he's suspicious, the risk is mitigated because we're talking about a conclusion as opposed to specific facts. What about the consent to search the airplane? Your Honor, the consent, again, I agree with Ms. Young accurately represented the government's position. The United States would concede that if the detention is unlawful, the taint is consented. So operating under the assumption that the detention is not unlawful, then, again, we're looking at the totality of the circumstances, and as I acknowledged in the brief, certainly there are some that cut in Mr. Latore's favor, but on balance, they really don't. This was a conversational interview in a public place. It wasn't behind closed doors. There were the two HSI agents. There was the DCI agent who was nearby. Well, Matheson, when he actually encountered the defendant to try to get him to stop and not get into the plane, he was in the midst of getting into the plane, he shows his gun, does he not? Yes, Your Honor, and I believe his testimony was he was just showing his gun and badge to identify himself as a law enforcement officer. He had his jacket back so he could be seen? That's right, Your Honor. He did not draw the gun? There's no evidence that any weapons were ever drawn. Mr. Latore is told that it's consensual. Agent Lowry's testimony wasn't super clear. When I asked him questions about what he said and also questions about if Mr. Latore asked questions, Agent Lowry's responses really were sort of more about generalities. You know, when I'm doing a consensual interview, I say this, or Mr. Latore is the type of guy who will ask questions if he's confused, but even allowing for potential ambiguities in the testimony. But his documents were held while this conversation was ongoing, right? The testimony, as you indicated, Your Honor, is that they're sitting on, I believe, a chair between the agents and Mr. Latore, but certainly they were never returned to him. And he was told he could leave, free to leave? Was that said? The phrase free to leave was said, Your Honor, by Agent Lowry, but again, it would be good to go back and check that portion of the record because I believe he may have been testifying about, when I do a consensual interview, here's what I say. I don't know that he specifically said, I told Mr. Latore he's free to leave, so that detail would be worth checking. But on balance, the totality of the circumstances indicates that consent was freely given. One point I'll emphasize that I emphasized in the brief as well, there was a suggestion, based on testimony by the defense expert, that there's a culture of compliance among pilots and that they do as they're asked because they're very worried about losing their licenses, which, well and good, maybe could be true for some pilots as a general matter. But Mr. Latore's behavior in this case suggests that's not true for him because when Agent Mattson originally was asking to speak with him, and this may have been before he drew the jacket back, I didn't check that, but in any event, when Agent Mattson first tries to speak to Latore, he says no. So for all those reasons, Your Honor, the government would advocate that the district court's ruling be affirmed. Well, didn't Mr. Latore indicate that there was no physical mistreatment, no use of violent threats, violence or threats, no promises, no deceptions, no trickery? I'm not sure whether he did or not, Your Honor. Was that in the subsequent testimony? Yeah, I thought it was. I would agree with the underlying conclusion, Judge, that none of that was, there's no evidence of any of that. Well, I thought Latore acknowledged that. And I don't remember that detail, Your Honor. Thank you. Thank you, counsel. Thank you both for your arguments this morning. The case is submitted.